**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| VERVAIN, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KINGSTON TECHNOLOGY COMPANY, INC., KINGSTON DIGITAL, INC., AND KINGSTON TECHNOLOGY CORPORATION,<br><br>Defendants. | C.A. No. 1:24-cv-00254-ADA<br><br>Jury Trial Demanded |
| VERVAIN, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PHISON ELECTRONICS CORPORATION,<br><br>Defendant. | C.A. No. 1:24-cv-00259-ADA<br><br>Jury Trial Demanded |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**I. INTRODUCTION ..... 1**

**II. BACKGROUND ..... 2**

**A. Patents-in-Suit ..... 2**

**B. Person of Ordinary Skill in the Art ..... 4**

**III. LEGAL STANDARD ..... 4**

**A. Means-Plus-Function Terms ..... 5**

1. Threshold Analysis for Non- "Means" Terms ..... 5
2. Claim construction under § 112, ¶ 6 ..... 6

**B. Improper Hybrid Claims ..... 7**

**IV. ARGUMENT ..... 7**

**A. "MLC" and "SLC" Terms ..... 7**

1. "SLC Memory Module" and "MLC Memory Module" Refers to More Than Just the Cell Itself ..... 8
2. The Difference Between SLC Memory and MLC Memory Is Not in the Cell, but the Associated Structure ..... 11
3. MLC Memory Structure Programs Pages in Two Passes; SLC Memory Structure Does Not 13
4. "Binary Mode" MLC is Not SLC ..... 15
5. Modules Are a Hardware Limitation ..... 18

**B. "blocks" ..... 19**

**C. "controller" and "FTL" adapted to perform their recited functions ..... 24**

1. A "Controller" is not sufficient structure for performing the claimed functions ..... 24
2. An "FTL" is not sufficient structure for performing the claimed functions ..... 26
3. Insufficient corresponding structure ..... 27

**D. "controller . . . maintain . . . controlling . . . performing"; "controller . . . maintain . . . controlling . . . transferring . . performing . . . reading . . . comparing"; "controller . . . maintain . . . controlling . . . transferring . . . performing . . . reading . . . comparing" ... 29**

**E. "data integrity test" ..... 31**

**F. "memory space" ..... 34**

**G. "memory element" .......... 35**

**H. "stored data" .......... 36**

**I. "retained data" .......... 39**

**J. "the mapping is performed as necessitated by the…system to maximize lifetime" 41**

**K. "remapping . . . and transfer of data . . . to achieve enhanced endurance" .......... 43**

**V. CONCLUSION .......... 44**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000)....................10

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)....................22

*Ariba, Inc. v. Emptoris, Inc.*,
2008 U.S. Dist. LEXIS 59862 (E.D. Tex. Aug. 7, 2008)....................7

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008)....................28

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)....................41, 42, 44

*Blackboard, Inc. v. Desire2Learn Inc.*,
574 F.3d 1371 (Fed. Cir. 2009)....................28

*Brazabra Corp. v. Ce Soir Lingerie Co.*,
2019 U.S. Dist. LEXIS 241487 (W.D. Tex. Aug. 15, 2019)....................41

*CA, Inc. v. Netflix, Inc.*,
2021 U.S. Dist. LEXIS 221133 (E.D. Tex. Nov. 16, 2021)....................41, 42

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)....................22

*Egenera, Inc. v. Cisco Sys.*,
972 F.3d 1367 (Fed. Cir. 2020)....................5, 6, 24, 28

*Eolas Techs., Inc. v. Adobe Sys., Inc.*,
810 F. Supp. 2d 795 (E.D. Tex. 2011)....................30

*EON Corp. IP Holdings, LLC v. AT&T Mobility LLC*,
785 F.3d 616 (Fed. Cir. 2015)....................7

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012)....................28

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)....................7, 29

*Konami Gaming, Inc. v. High 5 Games, LLC*,
2018 U.S. Dist. LEXIS 28337 (D. Nev. Feb. 21, 2018), *aff'd per curiam* 756 Fed. Appx. 994 (Fed. Cir. 2019)....................25, 26, 28

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
22 F.4th 1369 (Fed. Cir. 2022)....................38, 40

*Laitram Corp. v. Morehouse Indus., Inc.*,
143 F.3d 1456 (Fed.Cir.1998)....................37

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015)....................7, 28

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)....................33, 37

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898, 134 S. Ct. 2120 (2014)....................41

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)....................28

*Niazi Licensing Corp. v. St. Jude Med. S.C. Inc.*,
30 F.4th 1339 (Fed. Cir. 2022)....................41

*Noah Sys., Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012)....................7

*NTP, Inc. v. Research in Motion, Ltd.*,
418 F. 3d 1282 (Fed. Cir. 2005)....................40, 42

*Omega Eng'g, Inc v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................33, 39, 40

*ParkerVision, Inc. v. Vidal*,
88 F.4th 969 (Fed. Cir. 2023)....................38, 40

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................5, 9

*Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*,
989 F.3d 1002 (Fed. Cir. 2021)....................28, 29, 40

*Rembrandt Data Technologies, LP v. AOL, LLC*,
641 F.3d 1331 (Fed. Cir. 2011)....................19, 20, 21, 22, 29, 30

*Samsung Elecs. Co., Ltd. v. Elm 3DS Innovations, LLC*,
925 F.3d 1373 (Fed. Cir. 2019)....................37

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015)....................37, 42

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
987 F.3d 1358 (Fed. Cir. 2021)....................5, 6, 28

*Thorner v. Sony Comp. Entm't. Am. LLC*,
669 F.3d 1362 (holding that the term "attached" encompasses both external and internal attachment and that it was error to limit it solely to external attachments)....................23

*Traxcell Techs. LLC v. Nokia Sols. & Networks Oy*,
15 F.4th 1136 (Fed. Cir. 2021)....................36, 39

*Velocity Patent LLC v. Mercedes-Benz USA, LLC*,
2016 U.S. Dist. LEXIS 129342 (N.D. Ill. Sept. 21, 2016), *aff'd per curiam sub nom. Velocity Patent LLC v. FCA US LLC*, 784 F. App'x 787 (Fed. Cir. 2019)....................25, 28

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015)....................5, 6, 7, 24, 28

*XR Commc'ns, LLC v. Arris Sols., Inc.*,
2023 U.S. App. LEXIS 12187 (Fed. Cir. May 18, 2023)....................6, 28

*Yodlee, Inc. v. CashEdge, Inc.*,
No. 05–01550, 2006 WL 3456610 (N.D. Cal. Nov. 29, 2006)....................30

**Statutes**

35 U.S.C. § 101....................7

35 U.S.C. § 112 ¶¶ 1 and 2....................34

35 U.S.C. § 112, second paragraph....................6, 7

35 U.S.C. § 112 ¶ 2....................7, 19, 41, 43

35 U.S.C. § 112, ¶ 2 and § 101....................29

35 U.S.C. § 112, ¶ 6....................5, 6, 24, 27

# TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Proposed Terms and Constructions |
| 2 | Expert Declaration and CV of Andrew Wolfe, Ph.D. |
| 3 | U.S. Patent No. 8,891,298 to Rao |
| 4 | U.S. Patent No. 9,196,385 to Rao |
| 5 | U.S. Patent No. 9,997,240 to Rao |
| 6 | U.S. Patent No. 10,950,300 to Rao |
| 7 | U.S. Patent No. 11,830,546 to Rao |
| 8 | U.S. Patent No. 11,854,612 to Rao |
| 9 | U.S. Patent No. 11,967,369 to Rao |
| 10 | U.S. Patent No. 11,967,370 to Rao |
| 11 | U.S. Patent No. 8,194,452 to Rao |
| 12 | U.S. Patent No. 7,855,916 to Rao |
| 13 | U.S. Patent No. 6,456,528 to Chen |
| 14 | U.S. Patent Appl. Pub. No. 2010/0172179 to Gorobets |
| 15 | U.S. Patent Appl. Pub. No. 2011/0099460 to Dusija |
| 16 | U.S. Patent Appl. Pub. No. 2009/0172267 to Oribe |
| 17 | U.S. Patent Appl. Pub. No. 2010/0318879 to Yu |
| 18 | ’298 Patent Prosecution History Excerpts |
| 19 | ’385 Patent Prosecution History Excerpts |
| 20 | ’240 Patent Prosecution History Excerpts |
| 21 | ’300 Patent Prosecution History Excerpts |
| 22 | ’546 Patent Prosecution History Excerpts |
| 23 | ’612 Patent Prosecution History Excerpts |
| 24 | ’369 Patent Prosecution History Excerpts |
| 25 | ’370 Patent Prosecution History Excerpts |
| 26 | Exhibit A-1 of Vervain’s Preliminary Infringement Contentions to Phison |
| 27 | Exhibit A-4 of Vervain’s Preliminary Infringement Contentions to Phison |
| 28 | Manual of Patent Examining Procedure (“MPEP”) § 2173.05(p)(II) |
| 29 | Rino Micheloni et al., Inside NAND Flash Memories (Aug. 2010) (“Micheloni”) |
| 30 | Tue-Sung Jung et al., A 117-mm$^2$ 3.3-V Only 128-Mb Multilevel NAND Flash Memory for Mass Storage Applications, 31 IEEE J. Solid-State Circuits (Nov. 1996) (“Jung”) |
| 31 | Greg Atwood et al., Intel StrataFlash™ Memory Technology Overview, INTEL TECHNOLOGY J. (Q4 1997) (“Atwood”) |
| 32 | Ken Takeuchi et al., A Multipage Cell Architecture for High-Speed Programming Multilevel NAND Flash Memories, 33 IEEE J. SOLID-STATE CIRCUITS (Aug. 1998) (“Takeuchi”) |
| 33 | Taehee Cho et al., A Dual-Mode NAND Flash Memory: 1-Gb Multilevel and High-Performance 512-Mb Single-Level Modes, 36 IEEE J. SOLID-STATE CIRCUITS (Nov. 2001) (“Cho”) |
| 34 | Taeho Kgil et al., Improving NAND Flash Based Disk Caches, International Symposium on Computer Architecture (June 2008) (“Kgil”) |
| 35 | Se Jin Kwon et al., FTL algorithms for NAND-type flash memories (March 2011) (“Kwon”) |
| 36 | Boboila & Desnoyers, Write Endurance in Flash Drives: Measurements and Analysis (Paper), USENIX (Feb. 2010) |

| Exhibit No. | Description |
|---|---|
| 37 | Boboila & Desnoyers, Write Endurance in Flash Drives: Measurements and Analysis (Slides), USENIX (Feb. 2010) |
| 38 | Micron TN-29-61: Wear Leveling in NAND Flash Memory (April 2011) |
| 39 | Duann, SLC & MLC Hybrid Presentation (Aug. 2008) |
| 40 | Excerpts from Microsoft Computer Dictionary (5th ed. 2002) |
| 41 | Excerpts from Wiley Electrical and Electronics Engineering Dictionary (1st ed. 2004) |
| 42 | Excerpts from The Facts on File Dictionary of Computer Science (Rev. ed. 2006) |
| 43 | Excerpts from Principles of Information Systems (9th ed. 2010) |
| 44 | Excerpts from Database System Concepts (Custom ed. 2010) |
| 45 | Declaration of Sunil P. Khatri, Ph.D., *Vervain, LLC v. Western Digital Corp.*, No. 6:21-cv-00488 (W.D. Tex. Dec. 3, 2021), ECF No. 30-2. |
| 46 | Claim Construction Order, *Vervain, LLC v. Micron*, No. 6:21-cv-487 (W.D. Tex. Jan. 24, 2022), ECF No. 42. |
| 47 | Claim Construction Order, *Vervain, LLC v. Western Digital Corp.*, No. 6:21-cv-488 (W.D. Tex. Jan. 24, 2022), ECF No. 41. |
| 48 | Declaration of George Andrew Lever Rosbrook and Douglas Chin |

## I. INTRODUCTION

The eight Patents-in-Suit[1] purport to claim a novel way to control how data is stored and managed on flash memory having two types of memory modules: a faster, more durable "single-level cell" ("SLC") memory, and a higher-density and more cost- efficient "multi-level cell" ("MLC") memory. *See, e.g.*, '298 Patent, Background of the Disclosure, 1:61-67, 3:14-43.

However, the specification common to all the Patents-in-Suit is devoid of any meaningful disclosure.[2] The disclosure of the alleged inventions spans ***less than four pages*** of substantive text. *See e.g.*, '298 Patent, 3:56-7:5. There is no computer code or specific algorithm for performing the steps of the claimed processes included in the patents. And the patents disclose no novel hardware—they rely entirely instead on pre-existing, generic hardware and software components such as SLC and MLC memory modules and "controllers." While the patents disclose and claim "features," those are also not inventive. For example, though the patents claim "wear-leveling" processes that move "hot" and/or "cold" blocks to even out memory usage, that "feature" was in the prior art. *See, e.g.*, '298 Patent, Background of the Disclosure, 2:59-3:13 (describing wear-leveling).

Ultimately, although the patentee managed to convince a patent Examiner to issue these patents, there is nothing in the patents that warrant patent protection. Over the course of multiple prosecutions, litigation, and post-issuance Patent Office proceedings, the patentee has twisted and turned the minimal disclosure of the patents' specification in an attempt to avoid prior art while

[1] U.S. Patent Nos. 8,891,298 (the "'298 Patent"), 9,196,385 (the "'385 Patent"), 9,997,240 (the "'240 Patent"), 10,950,300 (the "'300 Patent"), 11,830,546 (the "'546 Patent"), 11,854,612 (the "'612 Patent"), 11,967,369 (the "'369 Patent"), and 11,967,370 (the "'370 Patent") (collectively, the "Patents-in-Suit").

[2] For convenience, citations to the common specification of the Patents-in-Suit will refer to the specification as presented in the first-issued '298 Patent.

obtaining entirely redundant patent claims. In many cases, as explained below, the resulting claims are simply unsupported by the specification and so ambiguous as to be wholly invalid. In other cases, the claims are expressed in a manner that is technologically nonsensical and have no useful commercial application.

Vervain hopes to gloss over these issues in most instances by construing these terms as "plain and ordinary meaning," so that Vervain can delay deciding what those terms actually mean. In other instances, Vervain seeks to rely on unsupported constructions from its prior lawsuits. The claim construction issues raised below, however, are specific to the issues in these cases—which involve new parties and four patents not previously asserted—and turn on intrinsic and extrinsic evidence and arguments not previously addressed by this Court. Accordingly, these claim construction and indefiniteness issues are ripe for the Court to address, and Defendants respectfully request that the Court adopt Defendants' proposed constructions.

## II. BACKGROUND

### A. Patents-in-Suit

The Patents-in-Suit are jointly titled "Lifetime Mixed Level Non-Volatile Memory System." They share a common specification, are part of the same family tree, claim priority to a single provisional application filed on July 19, 2011, and list the same sole named inventor, G.R. Mohan Rao. The patents are directed to systems and methods using a combination of single-level cell (SLC) and multi-level cell (MLC) NAND flash storage. Ex. 3 at 1:25-32; Ex. 2 (Wolfe Decl.) at ¶¶ 48-58. The common specification purports to identify an alleged problem with conventional memory systems: that a system using such combination of MLC and SLC requires different methods to manage writing data for improved lifetime. Ex. 3 at 3:38-45.

The Patents-in-Suit purport to disclose an improvement over the prior art with respect to the reliability and lifetime of a NAND flash storage system using conventional memory. *Id.* at

1:25-32; Ex. 2 (Wolfe Decl.) at ¶¶ 59-61. The two disclosed embodiments use two separate banks of NAND flash, with either one bank of dedicated MLC flash and a separate bank of dedicated SLC flash or two banks, each with a larger number of MLC modules and a smaller number of SLC modules. *Id*. at 4:51-58; Fig. 4; Ex. 2 (Wolfe Decl.) at ¶¶ 58-68. A controller disclosed as a chipset or an integral part of a host processor provides interface and memory control functions. *Id*. at 4:66-5:12. The controller may also maintain a translation table/address map or perform other functions. *Id.* at Abstract, 5:16-18.

The specification discloses MLC NAND flash as "a flash memory technology using multiple levels per cell to allow more bits to be stored using the same number of transistors," *Id.* at 1:61-64, adding that "[m]ost MLC NAND flash memory has four possible states per cell, so it can store two bits of information per cell," *Id.* at 1:65-67; Ex. 2 at ¶¶ 48-58. SLC NAND flash is disclosed as memory wherein "each cell can exist in one of two states, storing one bit of information per cell" *Id*. at 1:64-65; Ex. 2 at ¶¶ 48-58.

One purported improvement disclosed is a "data integrity test" the controller conducts "after every write," *Id.* at 4:55-56, or "as time permits," *Id.* at 5:32-40. In total, the specification discloses a data integrity test comprising: reading data from DRAM into controller memory; combining that data with the contents of NAND flash memory from a physical address range; erasing the NAND flash physical address range; writing the combined data into NAND flash memory; reading the data that was written into device controller memory; comparing the read data with retained data representing the combination of the previous contents and the data to be written; and remapping the NAND physical address range to the next available range of SLC NAND flash memory if the comparison does not result in a match. *Id*. at Figs 3A, 3B, 5:55-6:23. However, the

Patents-in-Suit do not disclose the purported invention (*e.g.*, through specific algorithms) beyond high-level, functional descriptions of the "data integrity testing." Ex. 2 at ¶¶ 64-68.

The other purported improvement disclosed is "wear leveling" — allocating "those blocks that receive frequent writes" into the SLC NAND flash memory module while allocating "those blocks that only receive infrequent writes" into the MLC NAND flash memory module. *Id.* at 6:24-29; Ex. 2 at ¶¶ 69-71. The allocation could be accomplished by the controller maintaining "a count of those blocks that are accessed (written to) most frequently," and transferring the contents of those blocks into the SLC NAND flash memory module on a periodic basis. *Id.* at 6:30-35. However, as noted above, the common specification admits that "wear leveling" was known in the art at the time of the Patents-in-Suit. *See id.*, Background of the Disclosure, 2:59-3:13 (describing wear-leveling); Ex. 2 at ¶¶ 69-71.

### B. Person of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSITA") at the time of the claimed subject matter would have had a Bachelor of Science degree in electrical engineering, computer engineering, or a closely related field, with at least 3-5 years of experience in the design of non-volatile memory systems and/or related software/firmware. An individual with an advanced degree in a relevant field would require less experience in the design of non-volatile memory systems and/or related software/firmware.

## III. LEGAL STANDARD[3]

The words of a claim are generally given their ordinary and customary meaning, and the ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*,

[3] Because the Patents-in-Suit have an earliest effective filing date before March 16, 2013, the pre-AIA provisions of Title 35 apply.

415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted). Moreover, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification and the prosecution history, including the cited prior art. *Id.* at 1313, 1315-17.

### A. Means-Plus-Function Terms

When a claim term lacks the word "means," the presumption against 35 U.S.C. § 112, ¶ 6 can be overcome if the challenger shows that a POSITA would have understood the term to recite, "a function but not sufficient structure for performing the function." *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021); *Egenera, Inc. v. Cisco Sys.*, 972 F.3d 1367, 1373 (Fed. Cir. 2020); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349-52 (Fed. Cir. 2015).

#### 1. Threshold Analysis for Non- "Means" Terms

There are **two separate** threshold inquiries by which a challenger can overcome the presumption against § 112, ¶ 6 for non- "means" terms:

> the presumption against means-plus-function interpretation is rebuttable if a challenger demonstrates that a claim term **<u>either</u>** fails to "recite sufficiently definite structure" **<u>or</u>** recites "function without reciting sufficient structure for performing that function."

*Egenera*, 972 F.3d at 1373 (quoting *Williamson*, 792 F.3d at 1349) (emphasis added)[4]; *see also, e.g.*, *Synchronoss*, 987 F.3d at 1367; *XR Commc'ns, LLC v. Arris Sols., Inc.*, 2023 U.S. App. LEXIS 12187, at *6-8 (Fed. Cir. May 18, 2023).

The first inquiry ("fails to recite sufficiently definite structure") can be satisfied by a showing that the claim term is, *e.g.*, "a generic term or black box recitation of structure," a "nonce" word (as in *Williamson*), or a term coined by the patentee. *Williamson*, 792 F.3d at 1349-51; *Egenera*, 972 F.3d at 1373. However, the § 112, ¶ 6 threshold analysis **does not** end with resolving

[4] Throughout, all emphasis added unless otherwise indicated.

the sufficiently definite structure inquiry. The analysis must **also** consider whether the claim recites "sufficient structure for performing the claimed function." *Egenera*, 972 F.3d at 1373-74.

In other words, even if the claim term recites "sufficiently definite structure," it can still fall within the ambit of § 112, ¶ 6 when considered in view of the recited function:

> The question is not whether a claim term recites *any* structure but whether it recites *sufficient structure*—a claim term is subject to § 112 [¶ 6] if it recites "function without reciting sufficient structure *for performing that function*." Egenera does not explain how its "logic"—even assuming it connotes some possible structure in the general sense of software, firmware, or circuitry—amounts to "*sufficient* structure for performing the [modification] function."

*Id*. (emphasis in original) (internal citations omitted).

### 2. Claim construction under § 112, ¶ 6

If a claim term invokes § 112, ¶ 6, there is a two-step process for construing the term. The first step is to identify the claimed function(s). *Williamson*, 792 F.3d at 1350-51. The second step is to determine whether sufficient structure is disclosed in the specification that corresponds to the claimed function(s). *Id.* If the specification fails to disclose adequate corresponding structure, the claim is indefinite. *Id.* at 1351-52.

When there are multiple claimed functions, as here, the patent must disclose, "adequate corresponding structure to perform **all** of the claimed functions." *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318-19 (Fed. Cir. 2012)). If the specification fails to disclose adequate corresponding structure for even one of the claimed functions, "we treat the specification as if no algorithm has been disclosed at all," and the claim is indefinite. *Noah*, 675 F.3d at 1312, 1318-19; *see also*, *EON Corp. IP Holdings, LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015)

### B. Improper Hybrid Claims

A single patent may include claims directed to one or more classes of patentable subject matter, but no single claim may cover more than one class[5]. *See IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); (MPEP 2173.05(p)(II)) (Ex. 28) ("A single claim which claims both an apparatus and the method steps of using the apparatus is indefinite under 35 U.S.C. § 112, second paragraph"). The Federal Circuit has reasoned that so-called hybrid claims covering two statutory classes of patentable subject matter are invalid because they do "not apprise a person of skill in the art of [the claim's] scope." *IPXL*, 430 F.3d at 1384 ("Because claim 25 recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, paragraph 2); *see Ariba, Inc. v. Emptoris, Inc.*, 2008 U.S. Dist. LEXIS 59862, at *21-24 (E.D. Tex. Aug. 7, 2008).

## IV. ARGUMENT

### A. "MLC" and "SLC" Terms[6]

The terms "MLC non-volatile memory" and "SLC non-volatile memory" are central to the claimed subject matter of the Patents-in Suit, and a clear, complete construction will aid the jury, the Court, and the parties with evaluating these patents on their merits. The Court has previously visited these terms in an earlier set of cases,[7] and Vervain asks the Court to simply re-adopt its

---

[5] 35 U.S.C. § 101 identifies the statutory classes of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."

[6] The "MLC / SLC terms," as they are articulated in various forms among the Patents-in-Suit, are: "MLC non-volatile memory," "MLC non-volatile memory module," "MLC memory modules," "SLC non-volatile memory," "SLC non-volatile memory module," and "SLC memory module."

[7] Those cases were coordinated for a single claim construction hearing, and the Court issued a single claim construction order. Ex. 46; Ex. 47.

earlier constructions. Those constructions are articulated in terms of what a cell "stores." While Vervain's proposed constructions are not entirely incorrect, they are nevertheless incomplete and should be refined to address the particular issues that will be in dispute in the current actions. Specifically, Defendants' proposed constructions—which account for a substantial amount of intrinsic evidence not previously presented to the Court[8]—recognize that what distinguishes SLC and MLC is not the cell itself. Rather, it is the **structure** *around* the cell, including circuitry and programming, that dictate the differences between SLC and MLC memory modules. Kingston's proposed construction recognizes these differences by referencing how the memory is "structured" (*i.e.*, the memory is "structured to store" multiple bits or one bit per cell). Phison accounts for them by detailing the operation of the surrounding "circuitry" (*i.e.*, specifying that the memory is "arranged with circuitry capable/incapable of storing multiple logical pages in a single physical page of cells") Regardless of the specific wording of their respective constructions, and as explained further below, Kingston and Phison's proposals are based on the same fundamental idea: the terms should be construed to reflect that the difference between SLC and MLC is in the memory module's structure/circuitry.

### 1. "SLC Memory Module" and "MLC Memory Module" Refers to More Than Just the Cell Itself

Vervain's proposed claim constructions, focus exclusively on whether a given cell "stores one bit" or "stores multiple bits" of information. In these actions, this misplaced focus is substantively incomplete. Ex. 2, ¶ 120. That is because the Vervain constructions are focused

[8] This refers to (i) the Certified File Wrapper of Application No. 13/455,267, which resulted in the '298 Patent, (ii) U.S. Patent No. 7,855,916 Ex. 12), which was incorporated by reference in the specification at paragraph [001], and (iii) three Information Disclosure Statements ("2012 IDS," Ex. 18 at 2-11) presented to the patent office during prosecution that cited forty "non-patent literature documents," which are referred to here as "IDS#_" according to their appearance on those statements.

entirely on the *contents* of the cell. *Id.* But a "cell" that "stores," by itself, does not make a "memory" or a "memory module": memory requires both the ability to store and retrieve information.[9] Thus, defining an SLC or MLC "memory"/"memory module" simply in terms of its storage ability is inadequate for these actions, where issues of infringement and validity are likely to turn on whether a particular memory is MLC or SLC.

The intrinsic record of the Patents-in-Suit demonstrates that defining SLC and MLC memory requires looking at more than just the cell. Ex. 2, ¶ 121. This intrinsic evidence—not previously addressed with this Court–includes disclosures incorporated by reference in and many of the forty documents filed with the application for the '298 Patent on April 25, 2012. *Id.* Together they provide the best evidence of what was meant by the disputed terms. *Phillips*, 415 F.3d at 1317.

One prime example is the Rao '916 Patent, another patent issued to the named inventor of the Patents-in-Suit. The Patents-in-Suit expressly incorporate Rao '916 by reference, and it is therefore considered to be part of the specifications themselves. Ex. 3 at 1:12-16; *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). Figure 6 of Rao '916 shows graphically the type of "memory" at issue in this case:

[9] The MICROSOFT COMPUTER DICTIONARY 333 (5th ed. 2002) (Ex. 40): "**memory** *n.* A device where information can be stored and retrieved.




Ex. 12 at Fig. 6 (blue and red annotations added Ex. 2, ¶ 123. Here, the entire "memory" is shown, outlined by the blue annotation. *Id.* The "cells" are part of the NAND flash array (red annotation) and are but one small part of the "NVMS Flash Memory" as understood and proposed by the patent applicant himself in 2012. *Id.* Indeed, in Rao '916, the named inventor of the Patents-in-Suit expressly disclosed SLC and MLC as "memory integrated circuits"—not just as cells. Ex. 12 at 1:35-36 ("The memory integrated circuits used in such a system may be SLC (single level) or MLC (multi level) storage"); Ex. 2, ¶ 123.

The same broader view of MLC and SLC memory can be seen in other parts of the intrinsic record, including a paper by Jung (Ex. 30 (IDS #6)) submitted to the Patent Office during prosecution. Ex. 2, ¶ 122. This paper is one of the earliest references to "multi-level" flash memory architectures. *Id.* As with Rao '916, Figure 1 of Jung depicts the entire "core architecture" of a "NAND flash memory" (annotated in blue, below), and shows not just the "cell array" (red), but also the necessary circuitry for reading and programming to those cells:



Fig. 1. Simplified core architecture of the 128-Mb NAND flash memory.

Ex. 2, ¶ 122.

A POSITA reading the claims in light of the specification (including the incorporated references) and the intrinsic record would therefore understand that an SLC/MLC "memory" or "memory module" necessarily encompasses more than just what is happening at the cell level. Ex. 2, ¶ 124. Thus, a complete and accurate construction of the SLC/MLC "memory" and "memory module" terms must take into account the additional structure beyond the cells that contribute to the distinctions between SLC and MLC.

### 2. The Difference Between SLC Memory and MLC Memory Is Not in the Cell, but the Associated Structure

What makes a memory "single level" or "multi-level" is not the cell itself, but rather the surrounding structure (architecture or circuitry) of the memory or memory module that operates the cell. Ex. 2, ¶ 125. Indeed, one of the very first multi-level flash memories was developed by changing the circuitry and programming associated with the transistor of a pre-existing single-level cell memory. The illustrations below are from the Atwood paper (Ex. 31) which was cited to the Patent Office during prosecution and is part of the intrinsic record of the Patents-in-Suit. Ex. 2, ¶ 125. The graph on the left is from an SLC memory. Ex. 31, Figs. 6 and 7; Ex. 2, ¶ 125.

In the SLC graph, the voltage peak on the left represents a 1 and the peak on the right represents a 0. *Id.* The graph on the right is from an MLC memory. *Id.* In that graph, there are four voltage peaks, and they are more narrowly-spaced. *Id.* Those four peaks represent four different values: 11, 10, 01, 00:




**Figure 6: Single bit/cell array threshold voltage histogram**




**Figure 7: Two bit/cell array threshold voltage histogram**

*Id.*

These differences between the SLC and MLC are due to the structure associated with the cells, *i.e.*, the associated circuitry and algorithms. *See* Ex. 2, ¶ 126; Ex. 3 at 3:15-19 ("Most MLC NAND flash **architectures** allow up to four (4) values per cell; *i.e.*, '00', '01', '10', or '11'"). Because the voltages are more closely spaced, MLC requires that a device's circuitry and programming be capable of both applying and reading voltage levels more precisely. Ex. 2, ¶ 126. This is not a point in dispute; Vervain's own expert agreed in the earlier lawsuits:

> The primary difference between SLC and MLC is what data each threshold voltage represents. With SLC flash, the transistor stores only a 1 or 0, so a wide range of threshold voltages can be allotted to a single bit. This allows for faster and more reliable memory access. On the other hand, **MLC flash must be slowly and carefully programmed to a narrower, more precise range of threshold voltages**, with each threshold voltage range representing a specific pair of bits. As a result, the above **MLC cell requires**

> **two successive read operations** to determine which pair of bits were stored in it.

Ex. 45 at ¶ 31. In other words, MLC and SLC differ because MLC's circuitry must be capable of setting narrowly spaced voltages, and reading MLC requires two operations to read the stored information. Ex. 2, ¶¶ 127. SLC memory, in contrast, does not require the same precision in setting/reading the voltages, and requires only a single read operation. *Id.* These structural differences, in turn, result in the well-understood tradeoffs between SLC and MLC memory in terms of speed, memory density, cost, and lifetime. *Id.*; Ex. 3 at 3:19-27, 3: 36-37.

### 3. MLC Memory Structure Programs Pages in Two Passes; SLC Memory Structure Does Not

The intrinsic record further underscores the structural, algorithmic difference between SLC and MLC memory, namely that MLC memory writes pages in two passes (*i.e.*, programs two logical pages in one physical page), whereas SLC memory does it in a single pass (*i.e.*, programs one logical page in one physical page). In a 1998 paper by Takeuchi (Ex. 32, (IDS #9)) the author proposed an MLC memory similar to that of Atwood. *See* Takeuchi, 1230. In particular, Takeuchi detailed a two-step procedure for writing two bits to a single cell, by first writing one logical page to a physical page of the cells, and then in a different operation, writing a second logical page to the same physical page of the cell. (Ex. 32 (IDS #9)). As Takeuchi explains in connection with the following diagram:




> [T]he proposed cell contains two "pages." Here, a "page" means the group of memory cells that are programmed simultaneously. In other words, the 2-bit data of each cell correspond to two *X* addresses *Xl, X2*, and the **programming of *Xl* and that of *X2* are performed during different operations**. As shown in Fig. 6, at the **first page program**, the memory cell is programmed to the "1" state. After that, the "0" or "1" cell is, respectively, programmed to the "2" or "3" state during the **second page program**. Fig. 7 shows the $V_{th}$ distribution.

*Id.* at 1230.

Takeuchi's two-page programming description is further disclosed throughout the prior art. For example, U.S. Patent No. 6,456,528 to Chen for "Selective Operation of a Multi-State Non-Volatile Memory System in a Binary Mode" Ex. 13, filed Sept. 17, 2001, showed Figs. 10A and 10B for respectively in two passes programming a "lower page" (least significant bit):




FIG._10A

and an "upper page" (most significant bit)




FIG._10B

resulting in the two-bit (MLC) distribution of Fig. 11:




FIG._11

In light of the state of the art at the time of the claimed subject matter, a POSITA would have understood that this two-stage programming was a defining aspect of MLC memory. Moreover, the POSITA, reading the specification of the Patents-in-Suit and seeing no alternate method disclosed for programming MLC memory, would understand that the MLC memory of the asserted claims would use this two-stage programming and that the SLC memory would not.

### 4. "Binary Mode" MLC is Not SLC

Based on the *extrinsic* evidence Vervain identified, Vervain appears to contend that the term "SLC memory" is so expansive as to include "MLC memory" that is only partially filled. This is incorrect. There is no support in the intrinsic evidence that a POSITA would have had such an expansive understanding around the time of the Patents-In-Suit.

As an example of partially-filled "MLC memory," Chen '528 disclosed the use of MLC memory in "binary mode" (title) or "two-state mode" (9:51, 11:28-29), where only a single bit of data (either a "1" or a "0") has been stored in an MLC memory cell. This is accomplished by writing to the MLC memory with only one pass and writing only the "lower page," resulting in greater separation of the voltage threshold distributions as shown in Fig. 12:




*FIG._12*

This storage of information representing only one logical page is performed using the more complex and precise MLC memory circuitry and algorithms, *See* Ex. 45 at ¶ 31, and is something less optimal than SLC memory. *See e.g.*, U.S. Patent Appl. Pub. No. 2010/0172179 (Ex. 14), ¶[0083] ("[T]his approach does not fully optimize the range of the threshold window as in the case of a single-level cell ("SLC") memory" but "has the advantage of using the same demarcation or sensing level as in the operations of the lower bit of the MLC memory"). In contrast, SLC memory only ever writes one page; it does not have the circuitry to write two bits to a single cell. In other words, the distinction between SLC memory and MLC memory is that SLC memory only has the circuity and algorithms to program one logical page to a corresponding physical page of cells (a single level of programming), while MLC memory has the circuity and algorithms to program multiple logical pages to a physical page of cells, even though it may save some wear by programming only one logical page to a physical page of cells.

Moreover, a POSITA would not understand MLC memory operating in a binary mode to be the SLC memory of the Patents-in-Suit. Indeed, having separate and distinct SLC and MLC memory is at the core of the claimed subject matter. The Patents-in-Suit say this very directly. And this is backed up by the specification, which discloses the claimed subject matter as "two separate banks of NAND flash" where "[o]ne bank contains economical MLC NAND flash, while a second bank contains high endurance SLC NAND flash." Ex. 3 at 4:51-55; *see also Id.* at FIG. 1 (depicting separate MLC and SLC flash), FIG. 4 (depicting SLC memory and MLC memory as separate and distinct), Abstract (separately referring to SLC and MLC four times each), 3:38-43 (referring to combining SLC and MLC memories in "a single (hybrid) system"), 3:56-4:24 ("a system for storing data which comprises at least one MLC non-volatile memory module…and at least one SLC non-volatile memory module…"), 6:36-46 ("…two NAND flash memory banks…memory bank 56 comprises a plurality of MLC NAND flash memory modules 60a, and a plurality of SLC NAND flash memory modules 62a"). Claim 1 of the '298 Patent, for example, expressly claims a system that has both SLC and MLC memory.

At no point in the Patents-in-Suit did the named inventor disclose either the SLC or MLC memory in terms of their operating modes, such as an SLC mode or an MLC operating in a binary mode. He plainly had the option to do so, given that descriptions of MLC operating in a binary "mode" were present in the intrinsic record, and deemed to be within the knowledge of a POSITA. *See, e.g.*, (Ex. 33 (Cho) (IDS #11); (Ex. 34 (Kgil) (IDS #2)); (Ex. 13, 9:51, 11:28-29). Dr. Rao chose to disclose the claimed subject matter based on distinct SLC and MLC memory modules—*i.e.* the specific physical pieces that make up the memory—not the mode in which they operate. Accordingly, Defendants respectfully request that the Court's constructions similarly reflect that

the SLC and MLC memory include the ***structures*** that differentiate SLC and MLC memory, and not be framed solely in terms of what the cell "stores."

### 5. Modules Are a Hardware Limitation

Defendants also request construction of "module" as a special form of "memory" under an ordinary and customary understanding of a hardware module as a chip.[10] The two terms are used interchangeably also with "flash."[11] In Defendants' proposed constructions of "MLC (non-volatile) memory" and "SLC (non-volatile) memory," each has distinct "memory cells arranged with circuitry" either *capable* or *incapable* "of storing multiple logical pages in a single physical page of cells."[12] This can exist on a chip (such as Rao '916 Fig. 6) or as embedded circuitry on a semiconductor die with other circuitry. The "module" limitation – chosen by the named inventor, Rao, and permeating the disclosure and every claim except those of the '300 Patent – would be understood as comprising the respective SLC and MLC memory arrangement and circuitry in a self-contained, complete and interchangeable instantiation such as a chip. The dependent claims of the '240 Patent support this view.[13]

---

[10] The MICROSOFT COMPUTER DICTIONARY 346 (Ex. 40) provides the following definition:

> In hardware, a self-contained component that can provide a complete function to a system and can be interchanged with other modules that provide similar functions. *See also* memory card, SIMM.

[11] Specifically, the dependent claims for both the '298 and '285 Patent recite limitations expressly stating that a "module is…flash memory" or a "module is…memory." *See* '298 Patent, claims 4, 5, 6, 7, 8, 9, and 10.

[12] While the "capable"/"incapable" language is specific to Phison's proposed construction, the same concept is present in Kingston's proposed construction which specifies that SLC memory is "structured to store *only* one bit per cell" and that MLC memory is "structured to store multiple bits per cell"

[13] Specifically, the dependent claims for the '240 Patent recite limitations stating that the SLC and/or MLC "comprise flash memories," "comprises a…RAM [random access memory]", or "comprises a …phase change memory." *See* Ex. 5 claims 20, 3, 4, 5, 7, 8, 10.

In sum, the MLC/SLC terms should be construed in terms of the structures (circuitry/algorithms) that make the two memory types distinct, and not merely whether they happen to store one bit or more at a given moment.

**B. "blocks"**

The term "block" is indefinite under 35 U.S.C. § 112 ¶ 2 because it is unclear whether each instance of the term in the claims means a block of *data* or a block of *memory*. Vervain's proposed construction contends that each instance of the term "block" means a "physical" block of "memory," but this construction renders the claims nonsensical and thus indefinite.

In flash memory, data is divided into smaller ***logical*** blocks of data, (Ex. 3, 2:21-23), and each logical block of data is assigned a unique logical block address (LBA). *Id.*, 2:13-17. The term "block" is used throughout the specification to refer to a **block of data**: "small blocks of data" (*Id.*, at 2:53), "blocks of static data" (*Id.*, at 3:12), "logical block" (*Id.*, 2:18), and "logical block address (LBA)" (*Id.*, at 2:67-3:1).

Furthermore, a NAND flash memory device is divided into smaller ***physical* blocks of memory**, and each physical block of memory is assigned a unique physical block address (PBA). *Id.*, at 2:31-33, 2:67. Because NAND memory must simultaneously erase all data stored in an entire physical block of memory, a physical block of memory in a NAND flash memory device is called an "erasable block" or an "erase block." *Id.*, at 2:38-48, 2:54, 3:58-64. The term "block" is used throughout the specification to also refer to a block of **memory**: "a block may comprise 32 to 64 pages, each of which incorporates 2-4 Kbit of memory" (*Id.*, col. 2:36-38), "an erased block" (*Id.*, at 2:45), "writes new data to the block" (*Id.*, at 3:11), "physical block" (*Id.*, at 3:2-3), and "physical block address (PBA)" (*Id.*, at 2:67).

Similarly, Figure 2 of the Patents-in-Suit illustrates a two-column address translation table that maps LBAs (assigned to blocks of **data**) in the left column to PBAs (assigned to blocks of

**memory**) in the right column. *Id.* at Fig. 2, 2:66-3:1, 3:67-4:4, 4:35-37, 5:20-24, 5:41-46. This table keeps track of which block of data is stored in which block of memory. Accordingly, the common specification uses the word "block" to mean either a block of data or a block of memory.

This dual meaning, however, means the claims in the Patents-In-Suit are at best ambiguous, because a POSITA would be unable to discern whether certain instances of "block" mean a block of *data* or a block of *memory*. For example, the first and second instances of "blocks" in claim 1 of the '298 Patent appear as "erasable blocks," *Id.*, at 7:9-12, and therefore mean blocks of memory, which must be erased simultaneously. The third, fourth, and fifth instances in that very same claim also must mean blocks of memory, because the definite article "the" in those instances indicates that they have antecedent basis in the first and second instances. *Id.* at col. 8:1-5.

However, there is confusion regarding the sixth and seventh instances of "blocks" in claim 1 of the '298 Patent,[14] which appear in the following recitation: "d) allocate those **[6] blocks** that receive the most frequent writes by transferring the respective contents of those **[7] blocks** to the at least one SLC non-volatile memory module. *Id.* at col. 6-9. The adjective "those" in front of the sixth and seventh instances of "blocks" refers to Step (c) of claim 1 that determines which of the blocks of memory in the MLC non-volatile memory module and the SLC non-volatile memory module are accessed most frequently. Therefore, Step (d) of claim 1 appears to refer to "those" blocks *of memory* that have been determined to be accessed most frequently. But it is impossible to "allocate those blocks [of memory]" (the sixth instance) to the SLC non-volatile memory module, as Step (d) requires. If "those blocks [of memory]" (the sixth instance) are already in the SLC non-volatile memory module, it would be nonsensical to allocate those blocks of memory to

[14] Claim 1 of the '385 Patent and claims 1 and 6 of the '240 Patent include similar recitations and therefore are indefinite for similar reasons.

the *SLC* non-volatile memory module. If "those blocks [of memory]" (the sixth instance) are in the *MLC* non-volatile memory module, then the claim cannot possibly mean that the blocks of memory inside the MLC non-volatile memory module are physically taken out somehow and placed inside the SLC non-volatile memory module.

Even if "those blocks" (the sixth instance) could be interpreted to mean blocks of memory, it is unclear how transferring the contents (*i.e.*, data) stored in those blocks of memory, as recited in Step (d), would result in allocating those blocks of memory to the SLC non-volatile memory module. It makes more sense that "those blocks" means blocks *of data* that are allocated from one memory module to another by simply transferring the blocks *of data* to the SLC non-volatile memory module, as Step (d) recites. However, that interpretation is inconsistent with the third, fourth, and fifth instances of "the blocks" (which mean blocks *of memory*) and with the seventh instance of "those blocks" (also blocks *of memory*). Because Step (d) recites "contents of those blocks," the seventh instance of "those blocks" means blocks *of memory*, and the "contents" means the *data* stored in the those blocks of memory. Therefore, the meaning of the sixth instance of "blocks" is unclear and there is no rational construction that would resolve the conflicting interpretations.

As another example, claim 1 of the '300 Patent[15] recites "the mapping maps **blocks**, pages, or bytes of data in either volatile or nonvolatile, or both, memories." Ex. 6 at col. 8:2-4. As explained above, an address translation table includes mappings between LBAs assigned to blocks of data and PBAs assigned to blocks of memory. Claim 1 of the '300 Patent is ambiguous as to whether the recited "blocks" means blocks **of data** or blocks **of memory**. It is unclear whether the

[15] Claim 12 of the '300 Patent and claim 1 of the '546 Patent include the same recitation and are therefore indefinite for similar reasons.

phrase "of data" applies to "blocks [of data and] pages [of data]" as well as "bytes of data." There are no other instances of "blocks" in the claim, and nothing else in the claim helps a person of ordinary skill in the art to ascertain whether this instance of "blocks" means blocks of data or blocks of memory.

Vervain proposes to fix this ambiguity by construing *every* instance of "blocks" in all the claims to mean blocks of memory, *i.e.* a "physical group of cells." However, the applicant knew how to clarify between "blocks of data" Ex. 3 at 3:12) versus "a block . . . of memory" (*Id.* at 2:36-38) in the specification, and Vervain's "clarification" is too little, too late. Courts do not rewrite claims to fix the patentee's ambiguities. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Even if the Court adopts Vervain's construction, the claims would recite a nonsensical meaning and therefore remain indefinite.

Vervain's proposed construction also contradicts its own infringement contentions, which point to blocks of "frequently accessed *data*" in Phison's accused products. Ex. 26 (Vervain's Prelim. Infringement Contentions at 33). Similarly, regarding "the mapping [that] maps blocks, pages, or bytes of data" in claim 1 of the '300 Patent, Vervain contends that "Phison's controller use address tables . . . and map *logical* blocks." Ex. 27 (Vervain's Prelim. Infringement Contentions at 17). Vervain's flip-flopping between these meanings of "blocks" highlights the ambiguity of the term, showing it is fatally indefinite. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (claims "must be interpreted and given the same meaning for purposes of both validity and infringement analyses.").

In the alternative, to the extent that the Court determines that "blocks" is not indefinite, Defendants propose that the term should carry its "plain and ordinary meaning." Vervain's proposed construction of "blocks" improperly injects a limitation into the claims, namely that the

block is a "physical" block, referring to the physical cells that are in a memory. Implicit in this unduly narrow definition is the argument that "logical blocks"—blocks of data—are not encompassed by the claims. This is contrary to both the plain and ordinary meaning of the term, as well as the claims and the specification. Ex. 2 at ¶¶ 128-30.

Starting with the claim language itself, every asserted claim of the Patents-in-Suit uses the bare word "block." A POSITA would have understood that, in the NAND storage field, there are both "logical" blocks and "physical" blocks. Ex. 2 at ¶¶ 128-30. A logical block, like a physical block, can be written to, read from, and erased—all of the functions required by the Patents-in-Suit.

Moreover, the common specification demonstrates that the patentee knew how to specify when it was talking about a logical block or a physical block. Ex. 3 at 2:10-27 ("A plurality of sectors is typically combined to form a '**logical block**' having a unique logical address…"), 3:1-5 ("The controller's wear-leveling algorithm determines which **physical block** to use…"). Indeed, the surrounding context of the patent claims—namely the recitation of address maps containing both "logical and physical address[es]" for the system—demonstrates that the patentee intended to *include* logical blocks, not exclude them. *See* Ex. 3 at claim 1 ("address map…wherein each entry in the list of logical address ranges maps to a similar range of physical addresses"). The common specification contains similar explanations of the claimed subject matter that rely on logical blocks whose addresses are mapped to physical addresses. *See e.g.*, Ex. 3 at 5:20-24, and FIG. 3a step 104. Thus, because the claims do not expressly limit the term "block," and the specification does not expressly define "blocks" or otherwise disavow the broader claim scope, a POSITA would have understood that the term is not limited to only physical blocks. Ex. 2 at ¶¶ 128-30; *Thorner v. Sony Comp. Entm't. Am. LLC*, 669 F.3d 1362, 1367-68 (holding that the term

"attached" encompasses both external and internal attachment and that it was error to limit it solely to external attachments).

Thus, because the claims do not clearly indicate to a POSITA whether the claimed "blocks" are logical blocks of data or physical blocks of memory, the term renders the claims indefinite and invalid. However, to the extent the Court finds that the term is not indefinite, it should carry its plain and ordinary meaning—including both logical blocks and physical blocks—rather than narrowing it to just physical blocks, as Vervain proposes.

### C. "controller" and "FTL" adapted to perform their recited functions

"Controller" and "flash translation layer (FTL)" are subject to § 112, ¶ 6 because the claims fail to recite sufficient structure for performing the claimed functions identified below.[16] Ex. 2, ¶¶ 131-44; *Egenera*, 972 F.3d at 1373; *see supra* § III.A. Further, the "controller" and "FTL" terms are indefinite because the common specification fails to disclose adequate corresponding structure. Ex. 2, *id.*; *Williamson*, 972 F.3d at 1351-52.

#### 1. A "Controller" is not sufficient structure for performing the claimed functions

"The question is not whether a claim term recites **any** structure but whether it recites **sufficient structure** . . . **for performing** [the claimed] **function**." *Egenera*, 972 F.3d at 1374 (emphasis in original) (internal citations omitted); *see supra* § III.A.1.

In this case, the answer is clearly, "no." Ex. 2, ¶¶ 131-35.

The common specification does not provide any description or discussion of the structure of the claimed "controller" other than to say that it may be a "chipset" coupled to a processor or

[16] While "*FTL*" also appears in Claim 1 of the '300 Patent, Defendants only proposes that § 112, ¶ 6 applies to the term in the Claim 1 of the '385 Patent. As discussed below, the significant difference in scope between the recited functions of the "*FTL*" in these two patents emphasizes why § 112, ¶ 6 should apply to the '385 Patent. *See* Ex. 2, ¶¶ 136-43.

"may be an integral part of the (host) processor 12" and include "a number of input/output ports" Ex. 3 at 4:66-5:8; Ex. 2, ¶¶ 59-69, 131-35. Though various functions of a controller are disclosed in the specification and the claims, no other structure or algorithms are provided. *Id.* In the Patents-in-Suit, the disclosed and claimed "controller" fails to connote sufficient structure to a POSITA to be anything other than a means to perform the claims' recited functions. *See Ex Parte Vitek*, 032718 USPTAB, 2017-000744 (P.T.A.B. March 27, 2018) (finding "controller," disclosed as a "processor," is a means-plus-function term).

The *Konami* case (affirmed *per curiam*) is instructive here. *Konami Gaming, Inc. v. High 5 Games, LLC*, 2018 U.S. Dist. LEXIS 28337, at *44-45 (D. Nev. Feb. 21, 2018), *aff'd per curiam* 756 Fed. Appx. 994 (Fed. Cir. 2019); *see also Velocity Patent LLC v. Mercedes-Benz USA, LLC*, 2016 U.S. Dist. LEXIS 129342, at *16-18 (N.D. Ill. Sept. 21, 2016), *aff'd per curiam sub nom. Velocity Patent LLC v. FCA US LLC*, 784 F. App'x 787 (Fed. Cir. 2019). Like the present case, *Konami* involved multiple patents directed with claims to, *inter alia*, a "processor" or "game controller" that performed seven recited functions. *Id.* at *41. Likewise, the patents at issue in *Konami* also did not provide any description or discussion of the claimed "processor" other than referring to an unspecified "microprocessor" being included within a "control module." *Id.* at *40. The court found that those scant disclosures were not sufficient structure to accomplish all of the claimed functions and further noted that the existence of commercially available processors that had "the capacity to be programmed to perform the [claimed] functions" did not mean that the claimed "processor" or "game controller" connoted sufficient structure to perform the claimed functions. *Id.* at *42-45.

Like the "game controller" and "processor" claims in *Konami*, the "controller" terms are drafted in the same format as means-plus-function claims with the phrase "the controller is adapted

to" substituted for the phrase "means for," followed by purely functional language. 2018 U.S. Dist. LEXIS 28337, at *38; Ex. 2, ¶¶ 59-69, 131-35.

### 2. An "FTL" is not sufficient structure for performing the claimed functions

As with the "controller" terms, the claimed "FTL" does not recite sufficient structure to perform the claimed functions. While the term "flash translation layer" was generally known to a POSITA at the time of the '385 Patent, the recited functions of the claimed "FTL" in the '385 Patent are inconsistent with a POSITA's understanding of the term. Ex. 2, ¶¶ 59-69, 136-43; *compare* '385 Patent, claim 1 *with* '300 Patent, claim 1.

At the time of the '385 Patent, a POSITA would have understood the term "flash translation layer (FTL)" to refer to a "software layer" that performed a specific, limited function: facilitating logical-to-physical address mapping. Ex. 2, ¶¶ 59-69, 136-43; Exs. 35, 38, 42, 44. This is consistent with the use of "FTL" in the common specification (*see* Ex. 3 at 2:28-31, 2:49-62, 6:36-52) and claim 1 of the '300 Patent ("an FTL flash translation layer, wherein the at least one controller, or FTL, or a combination of both maintain an address table in one or more of the memory elements and random access volatile memory").

However, Claim 1 of the '385 Patent recites significantly more functionality than a POSITA would have understood a conventional FTL to be able to perform. Ex. 2, ¶¶ 59-69, 136-43. In '385 Patent claim 1, "FTL" is substituted for "controller" in '298 Patent claim 1 with the same recited functions and no additional structure. In the common specification, there are descriptions of an FTL as part of an "SLC architecture" with a NAND flash controller (Ex. 3 at 2:30-31), as a "driver" (*Id.* at 2:49-52), as a term for "firmware" (*Id.* at 2:59-64), and as "logic 54" managing components of a "NAND flash module 50" (*Id.* at 6:37-44). No algorithms are disclosed for performing the recited functions.

A POSITA would have understood the ’385 Patent to be directed to a specialized “*FTL*” unique to the ’385 Patent that performs the same functions as the “*controller*” terms discussed above. Ex. 2, ¶¶ 136-43; *see supra* §IV.C.1. In this case, a POSITA would have understood that implementing the claimed “FTL” (*e.g.*, firmware) would require modifying a conventional “software layer” with special programming beyond that of a conventional “flash translation layer” in order to perform the additional functions recited in the ’385 Patent. Ex. 2, ¶¶ 59-69, 136-43.

### 3. Insufficient corresponding structure

The claimed functions of the “controller” and “FTL” are generally:[17]

- maintain an address map of at least one of the MLC and SLC non-volatile memory modules
- determine if a range of addresses … fails a data integrity test … [and in the event of such a failure] remap the entry to the next available equivalent range of physical addresses within the at least one SLC non-volatile memory module
- determine which of the blocks of the plurality of the blocks in the MLC and SLC non-volatile memory modules are accessed most frequently by maintaining a count of the number of times each one of the blocks is accessed
- allocate those blocks that receive the most frequent writes by transferring the respective contents of those blocks to the at least one SLC non-volatile memory module
- operate memory elements and associated memory space
- controlling access of the MLC and SLC nonvolatile memory elements and the random access volatile memory for storage of data therein

Because the “controller” and “FTL” terms are subject to § 112 ¶ 6, the specification must disclose sufficient structure corresponding to the functions performed by those elements.

[17] While the eight Patents-in- Suit contain some variation in the recitation of the claimed functions across the 57 Asserted Claims, the functions identified herein are representative of the recited functionality of the “*controller*” and “*FTL*” across all Patents-in-Suit.

*Williamson*, 792 F.3d at 1351–54; *see supra* § II.B.2. The Federal Circuit has repeatedly held that the disclosure of a general-purpose computer or conventional microprocessor is insufficient for computer-implemented claims, and that the specification must disclose the specific algorithms corresponding to **each** recited function. *E.g.*, *Egenera*, 972 F.3d at 1373; *Rain Computing, Inc. v. Samsung Elecs. Am., Inc.*, 989 F.3d 1002, 1007 (Fed. Cir. 2021) (disclosure of specific memory device examples failed to supply adequate structure for the function "configured to control access"); *Synchronoss*, 987 F.3d at 1367; *Media Rights*, 800 F.3d at 1374; *XR Commc'ns*, 2023 U.S. App. LEXIS 12187, at *6-8; *Konami*, 2018 U.S. Dist. LEXIS 28337, at *44-45; *Velocity Patent*, 2016 U.S. Dist. LEXIS 129342, at *16-18.[18]

Here, in the claims of the '298 Pat, '385 FTL, '240, '546, '369 and '370 Patents, the "controller's" functions include "maintain[ing] an address [map/table]," "remap[ping]" and "allocat[ing]/transfer[ring]" blocks of data to memory. Ex. 3 at cl. 1, 11; Ex. 4 at cl. 1; Ex. 5 at cl. 1, 6; Ex. 6 at cl. 1, 3, 7, 12; Ex. 7 at cl. 1, 3; Ex. 8 at cl. 1-3; Ex. 9 at cl. 1, 3, 8; Ex. 10 at cl. 1, 11, 16-18. In the claims of the '300, the controller remaps data after a failed data integrity test. Ex. 6 at cl. 7. While these functions are disclosed in the specification along with acknowledging the need for a wear leveling algorithm to maintain tables and allocate data to blocks. Ex. 2, ¶¶ 59-69, 136-44; Ex. 3 at 2:59-3:13. However, the only structure disclosed is that the "controller" may be a chipset or an integral part of a host processor. Ex. 2, ¶¶ 59-69, 136-44; Ex. 3 at 4:66-5:8. This is insufficient, as a disclosure reciting a general purpose computer also requires the disclosure of

[18] *See also, e.g.*, *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364–65 (Fed. Cir. 2012) ("rare" exception for computer not requiring "special programming" to perform the function); *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (algorithm required); *WMS Gaming*, 184 F.3d at 1349.

special programming, *i.e.*, an algorithm to provide sufficient structure. *Rain Computing* at 1007-08. There is nothing to explain how the controller is programmed to maintain the address map or what it does to transfer data, operations so crucial to the "lifetime" objective of the Patents-in-Suit based on "endurance" of the disclosed system. Because the specification fails to disclose sufficient structure for "controller," the term is indefinite.

**D. "controller . . . maintain . . . controlling . . . performing"; "controller . . . maintain . . . controlling . . . transferring . . performing . . . reading . . . comparing"; "controller . . . maintain . . . controlling . . . transferring . . . performing . . . reading . . . comparing"**

In addition, the "controller . . . maintain" claim terms are all directed to either "A *system* for storing data . . ." ('300, '546) or "A memory *system* for storing data . . ." ('369), but include method steps purportedly performed by the "controller," and are therefore invalid as indefinite under 35 U.S.C. § 112, ¶ 2 and § 101. *IPXL Holdings, LLC*, 430 F.3d at 1384; MPEP § 2173.05(p)(II) (Ex. 28).

The method steps at issue "control[]", "perform[]", "transfer[]", "read[]", and "compar[e]," with the specific recitations: "the controller, or FTL, or a combination of both *maintain* an address table . . ." "the controller *controlling* access . . ." the controller *performing* a data integrity test . . ." ('300 cl. 1, 12); "the [at least one] controller, or the FTL, or a combination of both *maintain* an address table . . ." "the controller *controlling* access . . ." "the controller, in at least a Write access operation *transferring* the stored received data . . ." "the controller *performing* a data integrity test . . .by *reading* . . . and *comparing* the stored data . . ." ('546 cl. 1; '369 cl. 1).

While a system or apparatus claim may include terms that describe a *capability* of part of the system, it may not recite terms that are conventionally used for method steps, or it is invalid. *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011). In *Rembrandt*, a number of system elements were followed by the *single*, final "***transmitting***" term

in claim 1, which, in the Federal Circuit's opinion, rendered it invalid. *Id.* at 1339.

Here, when read in context, two method terms in the claims of the '300, 546, and '369 Patents *alone* render the noted claims invalid:

> the controller ***controlling access*** of the physical MLC and SLC nonvolatile memory elements . . .
>
> the controller ***performing a data integrity test*** on stored data in the given one of the MLC nonvolatile memory elements . . .

'300, cl. 1; '546, cl. 1, '369, cl. 1. Note, however, that these are not the only method steps in the claims.

In *Rembrandt*, the Federal Circuit determined that "transmitting . . . frames" was an invalidating method step because it was described *as a step* rather than a *capability* of the "data transmitting device," and the form of the claim did not indicate *clearly* (although it implied) that "transmitting" the frames was a "capability" of the device.

Although an exception may apply when a *capability* of the apparatus is described in the claim in a way that does not require the actual performance of a method step, *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F. Supp. 2d 795, 812 (E.D. Tex. 2011); *see Yodlee, Inc. v. CashEdge, Inc.*, No. 05–01550, 2006 WL 3456610, at *4 (N.D. Cal. Nov. 29, 2006), that exception does not apply here. In the noted claims, the "performing" step is disclosed as only occurring "*after* . . . a Write access operation," further indicating that this step *must actually be performed* for infringement to occur—the Write access operation, as well as other conditions of the data integrity test, are only done when the memory is being used. The claims thus require that the controller actually performs numerous method steps, and infringement only occurs when it does so. There is no claim language that indicates the claimed "controller" includes or uses instructions that, when executed, "maintains an address table," "controls access," of memory elements, "transfers stored data,"

"performs" a data integrity test, "reads" stored data, or "compares" stored data. Thus, because '300 cl. 1, 12, '546 cl. 1, and '369 cl. 1 all recite method steps within a system, they are indefinite.

**E. "data integrity test"**

Defendants' proposed construction is consistent with the claims and the specification and prevents the improper recapture of claim scope the applicant disavowed during prosecution.

Because data actually written to and stored in memory may be different from the data intended to be written, the independent claims of the Patents-in-Suit recite "a data integrity test" that checks whether data was accurately written to memory. For example, claim 1 of the '300 patent explains how "the controller" performs "a Write access operation to the MLC nonvolatile memory element." Ex. 6 at col. 7:54-58. To write data to the MLC nonvolatile memory element, the controller "retain[s a copy of the] data in the random access volatile memory" ("retained data") and "store[s another copy of the] data in the MLC nonvolatile memory element" ("stored data"). *Id.* at col. 7:58-60. Next, "the controller perform[s] a data integrity test" to check that the data was correctly written to the MLC nonvolatile memory element. *Id.* at col. 7:61. This test is performed by "comparing the stored data [in the MLC nonvolatile memory element] to the retained data in the random access volatile memory." *Id.* at col. 7:64-65. Claim 1 of the '546 Patent, claim 1 of the '612 Patent, and claim 1 of the '369 Patent also recite that the data integrity test is performed by comparing the stored data in the MLC nonvolatile memory element to the retained data in the random access volatile memory. Ex. 7 at col. 8:10-20; Ex. 8 at col. 8:18-28; Ex. 9 at col. 8:14-24. Thus, the claims confirm Phison's proposed construction of "data integrity test" as "a test that compares stored data to retained data."

Consistent with the asserted claims, the common specification discloses only a comparison of the stored data to the retained data to check that the data actually written to and stored in memory matches the data intended to be written. Ex. 3 at Fig. 3b, col. 6:5-12. The specification does not

disclose any other type of data integrity test for checking that the data was accurately written to memory.

Moreover, applicant *disclaimed* a different type of data integrity test that involves an error correction code (ECC) during the prosecution of the '300 and '546 Patents. During the '300 Patent prosecution, the applicant added "the controller performing a data integrity test on stored data" to the claims, which were rejected by the examiner based on the prior art reference Oribe. *Id.* at Ex. 21 (2019/06/26 Amendment at 2; 2019/12/13 Office Action at 6). Oribe discloses a data integrity test that calculates an ECC (*i.e.*, metadata derived from the data using an algorithm) based on the data before writing the data to memory, then calculates another ECC based on the data stored in memory after writing the data to memory, and then confirms that the two ECCs match. Ex. 16 at ¶ 53. In response, the applicant highlighted "an important distinction" by arguing that Oribe's ECC-based data integrity test does not "require[] a retention of the data" for comparison with the stored data. Ex. 21 (2020/03/23 Amendment at 11). Even though the pending claims did not recite comparing stored data to retained data, the applicant nevertheless argued that Oribe's data integrity test "is not a compare operation" between the stored data and the retained data. *Id.* (2020/03/23 Amendment at 13). Applicant subsequently *narrowed* the claim scope via amendment by explaining how the claimed data integrity test is performed: "the controller performing a data integrity test on stored data . . . <u>by comparing the stored data to the retained data</u>." *Id.* (2020/10/08 Amendment at 2). In view of the narrowing amendment, the examiner recognized that "the test [of Oribe] would be based on ECC as opposed to the claimed compare" between the stored data and the retained data, and allowed the '300 Patent. *Id.* (2020/10/15 Interview Summary).

Vervain disavowed the ECC-based data integrity test again during the prosecution of the '546 Patent. In response to an Office action, Vervain amended the claims by adding the same

recitation that led to the allowance of the ’300 Patent: “the controller performing a data integrity test on stored data . . . by comparing the stored data to the retained data.” *Id.* (2020/10/08 Amendment at 2). Vervain also argued that the prior art reference Dusija (Ex. 15) does not teach the claimed data integrity test. Ex. 22 (2022/08/08 Amendment at 5-16). Like Oribe, Dusija discloses an ECC processor that calculates an ECC of data before and after writing the data to memory. Ex. 15 at ¶¶ 12, 87-88, 112. Vervain distinguished Dusija’s “ECC check” from the claimed data integrity test by arguing that the “compare operation is different than the ECC operation.” Ex. 22 (2022/08/08 Amendment at 5, 15).

Vervain’s arguments during prosecution are clear and unmistakable disclaimer of ECC-based data integrity tests from the claimed “data integrity test” that compares the stored data to the retained data. The disclaimer made during the prosecution of the ’300 and ’546 Patents limits the scope of “data integrity test” in parent patents and child patents alike to include a comparison of the stored data to the retained data and to exclude an ECC check. *See Omega Eng’g, Inc v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). The independent claims in the ’298, ’385, ’240, and ’370 Patents do not recite the language that explains that the data integrity test is performed by comparing the stored data to the retained data, but because the claims in these four patents recite the exact same term “data integrity test,” and Vervain’s arguments during the prosecution of the ’300 Patent serve as public notice that the term “data integrity test” alone excludes an ECC check, the term’s construction should be consistent throughout the entire family of patents. *See Omega*, 334 F.3d at 1334.

### F. "memory space"

The term "memory space" is indefinite under 35 U.S.C. § 112 ¶¶ 1 and 2 because it is not supported by the disclosure, is ambiguous, and thus fails to provide notice to a POSITA of what "memory space" means.

The word "space" appears in the specification only in the context of the general commercial market for hard disk drives, "HDD space." Ex. 3 at 2:28[19]. A POSITA would understand "memory space" to be a general *storage capacity property* of a memory. Beyond this, there is no support in the specification that explains the meaning of "memory space" when applied to storage other than hard disk drives, for example to volatile memory or MLC and SLC nonvolatile memory. As written in the '300 and '546 Patent claims, the term is also ambiguous because it could refer to an abstract quantity of memory or a physical structure. *See* Ex. 6 at cl. 1, 12; *See* Ex. 7 at cl. 1. As to the '612 Patent claims, a POSITA would understand the term "volatile memory" to be a physical thing. *See* Ex. 8 at cl. 1.

"Memory space" is neither defined as to its location, continuousness, or discreteness in the claimed systems and methods, nor whether it is physical or logical in nature, or some combination. The term is shown in the claims to be so ambiguous as to size or configuration that it may include a "memory element" at least as large as a modular computing device such as a hard disk drive (Ex. 7 at cl. 7) or as at least as small as a page with physical addresses (Ex. 10 at cl. 13). Thus, the term is indefinite and unsupported.

[19] Perhaps adding to the ambiguity, the '612 Patent Summary alone among the Patents-in-Suit states that "A method for storing data comprises maintaining an address table for a memory space containing volatile memory and nonvolatile memory space. The nonvolatile memory space includes *both* multi-level cell (MLC) space and single level cell (SLC) space and the volatile memory includes a random access volatile memory element." Ex. 8 at 4:16-22.

### G. "memory element"

The term "memory element" is unsupported and indefinite in context. It fails to provide notice to a POSITA of its meaning, even in the context of NAND flash. The specification nowhere mentions the term "element" except in a few sentences in the summary of a single Patent-in-Suit, the '612 Pat., 4:15-54, and in a boilerplate reservation of elements in claim drafting, Ex. 3 at 7:1-5. Moreover, "element" is only mentioned in the incorporated references to disclose, in Fig. 2 of the Rao '452 Patent, an "exemplary NAND memory integrated circuit as one element of the NVMS" (Ex 11 at 2:52-53).

Given the boundless scope of term "element," a POSITA would not understand whether it refers to a storage cell (perhaps most elemental), a writable word or page or an erasable block (as in the original recitation) or even "bytes" recited in the '300 Patent's mapping limitation. A "memory element" might be at least as large as a modular computing device such as a hard disk drive (Ex. 7 at cl. 7) or at least as small as a page with physical addresses. Ex. 10 at cl. 13. "Memory element" is thus neither defined as to its location, continuousness or discreteness in the claimed systems and methods, nor whether it is physical or logical in nature, or some combination.

The indefiniteness of this term is demonstrated from an amendment during the prosecution of the '300 Patent, wherein the MLC and SLC elements were qualified respectively as those "that can be mapped into the [MLC/SLC] memory space." Ex. 21 at (Oct. 8, 2020, Amendment at 2). This recitation is nonsensical in relation to NAND flash, where logical block addresses are mapped to physical addresses, and the latter are updated with each updating of data; it is an irrelevant limitation that what may be a logical or physical "element" can be mapped into abstract "memory space." Moreover, if "element" is understood to be some physical component of an SLC memory module (as inferred by the amendment), it would require the absurd result that a "memory element" comprising a hard disk drive as claimed in '546 Patent claim 7, for example, should be a physical

component of that SLC memory module. A POSITA would understand that it is physically impossible to install or somehow include a hard disk drive (HDD) on an SLC chip since the HDD is many orders of magnitude larger. Thus, the term is indefinite and unsupported.

### H. "stored data"

Defendants' construction is well-supported by the claim language, specification, and prosecution history. Ex. 2, ¶¶ 145-160. Significantly, during prosecution, Vervain argued that "*stored data*" refers to received data that is stored in non-volatile memory (NAND Flash). Ex. 2, ¶¶ 150-155. This distinction was crucial in overcoming prior art, such as U.S. Patent Pub. No. 2010/0318879 to Yu ("'879 Yu", Ex. 17), which did not involve comparing received data stored in non-volatile memory. Ex. 2, ¶¶ 154-155, 159. Vervain cannot now broaden the definition of "*stored data*" to include any kind of data stored within the memory hierarchy, such as error detection codes generated by the memory system, which are not received data stored in non-volatile memory. Ex. 2, ¶ 156. As the Federal Circuit has repeatedly held, claims must be construed consistently with arguments made to distinguish prior art. *See Traxcell Techs. LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021).

Defendants' construction aligns with the plain language of the claims.[20] *See, e.g.*, Ex. 7 at Claim 1; Ex. 2, ¶¶ 146-147. For example, Claim 1 of the '546 Patent discloses that "*received data*" is first temporarily stored in volatile controller memory and, in a Write access operation, transferred to nonvolatile memory as "*stored data.*" *See id.* A subsequent data integrity test is conducted on the stored data in the nonvolatile memory. *See id.* Consistent with Defendants' construction, "*stored data*" specifically refers to received data stored in non-volatile memory (*e.g.*,

[20] The term "*stored data*" appears claims of the '300, '546, '612, '369, and '370 Patents.

MLC non-volatile memory), not temporary data in volatile memory (*e.g.*, DRAM/controller memory) or memory-system-generated data. *See id*.

The common specification further supports Defendants' construction. *See* Ex. 2, ¶¶ 157-158. The controller transfers received data from volatile memory (*e.g.*, controller memory) to non-volatile memory, where data integrity tests are performed on the data after it has been written to non-volatile memory. *See* Ex. 3 at FIGS. 1 and 3a, 2:65-3:6, 4:64-5:15, 5:32-34, 5:55-6:23; Ex. 2, ¶¶ 157-158. This confirms Defendants' position that "*stored data*" refers to received data stored in non-volatile memory (NAND Flash) before a data integrity test. *See id.*

Further, during prosecution of the '546 Patent, to overcome an objection and prior art rejection based partly on '879 Yu, Vervain explicitly stated the claim language "**clearly refers to** the fact that … the **<u>received data</u> is stored in the non-volatile memory as '<u>stored data</u>.'**"[21] *See*

---

[21] The relevant arguments Vervain made regarding the scope of "*stored data*" during prosecution should apply to the claims of each of the '300, '546, '612, '369, and '370 Patents. *See Samsung Elecs. Co., Ltd. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1378 (Fed. Cir. 2019) (*citing SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015)); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (statements made in prosecution of one patent are relevant to the scope of all sibling patents); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 & n. 2 (Fed. Cir. 1998) (noting that it was proper to consider the prosecution histories of two related re-examination patents originating from the same parent, to determine the meaning of a term used in both patents). These patents stem from the same parent and share a common specification. Wolfe Decl., ¶¶ 148-149. Moreover, during prosecution of the '546, '612, '369, and '370 Patents, Vervain filed terminal disclaimers to overcome double-patenting rejections based on the claims of the '300 Patent. Ex. 22 (03-09-2023 Terminal Disclaimer); Ex. 23 (10-31-2023 Terminal Disclaimer); Ex. 24 (01-02-2024 Terminal Disclaimer); Ex. 25 at 10-12 (02-26-2024 Terminal Disclaimer); Wolfe Decl., ¶¶ 148-149. In those rejections, the Examine found the claims in each patent were "not patentably distinct from each other." Ex. 22 (09-09-2022 Final Rejection); Ex. 25 at 4-7 (02-23-2024, Non-Final Rejection); Wolfe Decl., ¶¶ 148-149. Indeed, each of the relevant asserted claims requires performing a "*data integrity test*" based on "*stored data*" in the "*MLC nonvolatile memory*" and retained data. *Id*. For example, Claim 1 of the '546 Patent requires comparing the "*stored data*" to "*retained data*." *See* Ex. 7 at Claim 1; Wolfe Decl., ¶¶ 148-149. As another example, Claim 1 of the '370 Patent requires "*a data integrity test performed … based upon received data retained at the controller and which received data is stored in the at least one MLC non-volatile*

Ex. 22 (09-09-2022 Final Rejection at 1, 5-12); Ex. 17 at ¶¶ [0027]-[0043]; Ex. 22 (03-09-2023 Applicant Arguments/Remarks Made in an Amendment at 6, 9-10); Ex. 2, ¶ 154; *see Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022) (finding lexicography where the patentee used the phrase "also sometimes referred to herein as"); *see also ParkerVision, Inc. v. Vidal*, 88 F.4th 969, 976 (Fed. Cir. 2023) ("'refer to' links the terms … to the clause").

Based on this understanding, Vervain argued '879 Yu does not disclose comparing received data stored in non-volatile memory, but instead compares data within volatile DRAM. *See* Ex. 22 (03-09-2023 Applicant Arguments/Remarks Made in an Amendment at 9-10); Ex. 2, ¶ 155. Vervain also specifically distinguished '879 Yu's error detection process, which compares memory-controller-generated "error detection information" in volatile memory. *See id.*; Ex. 17 at [0037] ("When the ['879 Yu's] controller 140 receives the write data from the host, its [SIC] will **generate** corresponding error detection information."); Ex. 2, ¶ 155; *see also* Ex. 21 (10-08-2020 Applicant Arguments-Remarks Made in an Amendment) (distinguishing U.S. Patent App. Pub. No. 2009/0172267 ("Oribe") "error correction bits" method of data integrity); Ex. 21 (03-23-2020 Applicant Arguments-Remarks Made in an Amendment at 13) ("It can be seen that [Oribe's] error check code is **created during a data write operation** such that, when read, a determination as to utilizing this error check code to correct the error can be made. However, this is not a compare operation with the data that was read…").[22]

*memory element as stored data…*" *See* Ex. 10 at Claim 1; Wolfe Decl., ¶¶ 148-149. Thus, construction of "*stored data*" should apply consistently across these patent claims.

[22] Dictionary definitions also support that "*stored data*" is different than error correction codes. *See* Wolfe Decl., ¶ 160.

Vervain now seeks to improperly expand "*stored data*" to recapture error correction codes and other information generated within the memory system, despite arguing during prosecution that it is received data stored in non-volatile memory. *See e.g.*, Ex. 27 (Vervain's Prelim. Infringement Contentions (Phison) at 16-17) (*e.g.*, "ECC engine," "CRC," "LDPC"); Ex. 2, ¶ 156. This shift is impermissible. *See Traxcell* 15 F.4th at 1141 (Fed. Cir. 2021) ("The doctrine 'ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.'"), *citing Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Vervain's attempts to expand "*stored data*" beyond received data stored in non-volatile memory should be rejected, as this would recapture surrendered claim scope. Ex. 2, ¶¶ 156, 159.

### I. "retained data"

Defendants' proposed construction is supported by the claim language, prosecution history, and the patent specification. Ex. 2, ¶¶ 161-167. Vervain's attempts to broaden this term contradict prosecution statements and should also be rejected. *See id.*

The claim language itself supports that "*retained data*" refers to a copy of the "*received data*" stored in volatile memory during the write process.[23] *See* '546 Patent, Claim 1 ("*operable to store the received data in the given one of the MLC nonvolatile memory elements as stored data and **retain such received data in the random access volatile memory as retained data** associated with stored data*"); Ex. 2, ¶ 162. This interpretation is consistent with Defendants' construction, distinguishing the copy of received data in volatile memory from the received stored data in non-volatile memory. *See id.*

The common specification further supports Defendants' construction. *See* Ex. 3 at 5:55-

[23] The term "*retained data*" appears in claims of the '300, '546, '612, and '369 Patents.

6:23, FIGS 3a and 3b; Ex. 2, ¶ 165. It discloses that volatile memory (*e.g.*, DRAM 20) retains a copy of received data for data integrity checks. *See* i*d.* For instance, in FIG. 3b, Step 114 discloses using retained data for later comparison after writing data to non-volatile flash memory (NAND Flash). *See id.*

Moreover, during prosecution, to overcome an objection and prior art rejection, Vervain argued the claim language "**clearly refers to** the fact that **<u>what is retained is a copy of the received data</u>** wherein, during a Write access operation, … the **received data is retained** in volatile memory **as 'retained data.'**" *See* Ex. 22 (09-09-2022 Final Rejection at 1, 5-12); Ex. 22 at (03-09-2023 Applicant Arguments/Remarks Made in an Amendment at 6); Ex. 2, ¶¶ 163-164; *Samsung* at 1378; *NTP* at 1293. Vervain distinguished this from Yu '879, which does not involve comparing received stored data with a copy in DRAM. *See* Ex. 22 at (03-09-2023 Applicant Arguments/Remarks Made in an Amendment at 9-10); Ex. 17 at [0030]-[0031], [0036]-[0043]-[0044], [0048], [0049]-[0052], FIGS. 2-3; Ex. 2, ¶ 164. Vervain should not be allowed to expand "*retained data*" to reclaim what it gave up during prosecution to distinguish prior art (*e.g.*, error correction codes, CRC, and parity checks generated by the memory device).[24] *See Traxcell at* 1141; *Omega* at 1323; *Kyocera* at 1378; *ParkerVision* at 976; *See e.g.*, Ex. 27 (Vervain's Prelim. Infringement Contentions (Phison) at 16-17); Ex. 2, ¶ 164. Again, Vervain's attempts to expand "*retained data*" would improperly recapture surrendered claim scope and should be rejected. *See id*.

---

[24] Dictionary definitions also support that "retained data" is different than error correction codes. *See* Wolfe Decl., ¶ 166.

### J. "the mapping is performed as necessitated by the…system to maximize lifetime"

This term is indefinite under 35 U.S.C. § 112 ¶ 2 in failing to provide notice to a POSITA of what it means to "maximize lifetime" or, indeed, **what** "lifetime" is "maximized."

When the claims recite terms of degree, they must provide, "objective boundaries for those of skill in the art." *Interval Licensing*, 766 F.3d at 1370-71 (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 134 S. Ct. 2120 (2014)); *Niazi Licensing Corp. v. St. Jude Med. S.C. Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022). When, as in this case, both the claim language and intrinsic evidence are devoid of any such objective standard, the terms of degree render the claims indefinite. *E.g.*, *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018); *CA, Inc. v. Netflix, Inc.*, 2021 U.S. Dist. LEXIS 221133, at *39 (E.D. Tex. Nov. 16, 2021) (finding computer-implemented claims directed to "maximizing" data writing speed and "minimizing" data retrieval time indefinite for lack of objective boundaries); *Brazabra Corp. v. Ce Soir Lingerie Co.*, 2019 U.S. Dist. LEXIS 241487, at *13-14 (W.D. Tex. Aug. 15, 2019).

As an initial matter, this term is indefinite because it does not specify which "lifetime" is purportedly "maximized" — the recited "controller"? The "MLC"? The "SLC"? The "random access volatile memory"? The entire claimed "system"? Ex. 2, ¶ 169. The asserted claims, common specification, and the prosecution history provide no guidance to answer that question. *Id.*

Further, even if a POSITA could determine which claim element(s) are implicated by this term, a POSITA would need to know when the "lifetime" is **objectively** "maximize[d]", rather than just exceeding the lifetime of another memory system implementation. *Berkheimer*, 881 F.3d at 1363 (finding "minimal redundancy" indefinite because, "the issue is not *what* must exhibit minimal redundancy, but rather *how much* is minimal") (emphasis in original); *CA, Inc.* 2021 U.S.

Dist. LEXIS 221133, at *39 (finding computer-implemented claims directed to "maximizing" data writing speed and "minimizing" data retrieval time indefinite for lack of objective boundaries). Notably, there is **very** little difference between the indefinite terms and their usage in *Berkheimer* and *CA, Inc.* and "maximize" here, and the intrinsic evidence similarly fails to provide an objective boundary for "maximize" here.

Notably, the "maximization" of something is much more difficult to determine than simply *improving* it—a maximum is a single value, which is harder to achieve or determine than other terms of degree. Specifically, a POSITA would have needed an **objective standard** for determining **how much** of an increase to the claimed "lifetime," would or would not constitute a "maximize[d] lifetime." Ex. 2, ¶¶ 170-73. This is particularly true here, where the same claims of the '300 Patent also include the limitation that the "remapping" is performed to "achieve **enhanced endurance.**" Ex. 6, cl. 1; Ex. 2, ¶¶ 169-73. Specifically, the patentee's decision to recite "achieve enhanced endurance" within in the same claims of the '300 Patent as "maximize lifetime" expressly indicate that the patentee intended the terms "maximize" and "enhance[]" to have different meanings. *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015)) ("Where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F. 3d 1282, 1293 (Fed. Cir. 2005).

However, neither a "maximized" lifetime nor any other lifetime is clearly defined in the specification. In fact, the '612 Patent specification is the only one that even includes the term "maximize," and it only parrots the claim language when doing so. Ex. 2, ¶¶ 169-73; Ex. 8 at Abst.: "The mapping is performed as necessitated by the system to maximize lifetime"; col. 4:23-25 (same)). The common specification only includes vague references to lifetimes of different

memory systems, and it also refers to increasing "reliability and lifetime," but does not shed any light on how a POSITA might determine what the purported maximized lifetime of the claimed system is. Ex. 2, ¶¶ 169-73; *see, e.g.*, Ex. 3 at col. 1:25-28: "This application relates to . . . a system and method of increasing the reliability and *lifetime* of a NAND flash storage system"; col. 6:53-55 (same); col. 3:43-45: various embodiments "provide[] *long lifetime* (endurance))"; col. 4:58-61: "[T]he SLC NAND flash is used to *boost the lifetime* (endurance)."

The patents' file histories also fail to provide *any* standard of when some "lifetime" would be "maximized," because the term's meaning is not discussed by the applicant or the Examiner. And Plaintiff's proposed construction of "plain and ordinary meaning" fails to provide any objective basis for the determination. *See Advanced Display Techs.*, 2012 WL 2872121, at *14 (meanings of terms proposed by patentee were themselves indefinite); Ex. 2, ¶¶ 169-73.

In view of the above, the Court should find that the limitation "the mapping is performed as necessitated by the . . . system to maximize lifetime" is indefinite.

### K. "remapping . . . and transfer of data . . . to achieve enhanced endurance"

This term is indefinite under 35 U.S.C. § 112 ¶ 2 because it fails to provide notice to a POSITA of what it means "to achieve enhanced endurance." More specifically, the phrase "achieve enhanced endurance" in the term renders claims 1 and 12 indefinite for the same reasons that "maximize lifetime," discussed above, is indefinite. The applicant essentially equated "endurance" and "lifetime" in the common specification. (Ex. 3, col. 3:19-21). Neither the specification nor the file history of the '300 patent provides an objective way for a POSITA to determine when or if "enhanced endurance" has been "achieved."

The main use of the term "endurance" in the '300 specification simply points to *relative* differences in endurance between SLC, MLC, and Hard Disk memories. Ex. 6 at col. 3:41-53; 4:36-41; 5:7-14. Where it is used otherwise, the specification merely states that because "the SLC

NAND flash is used to boost the lifetime endurance of the storage system, [the SLC NAND flash] can be considerably lesser in amount than the MLC NAND flash." *Id.*, col. 5:17-19. This provides no guidance as to endurance. Before determining *whether* endurance has been enhanced, one must determine *what* endurance is to be enhanced. According to Vervain's expert in a previous litigation, "A POSA would readily know that the endurance of a specific MLC nonvolatile memory element (cell) is much smaller than the endurance of a flash memory array as a whole, and that the latter is the endurance of interest. (Ex. 45 at ¶ 109.)

The endurance of "flash memory array[s] as a whole" (compared to individual MLC/SLC cells or blocks) is difficult to determine, because of great variations in how such systems are implemented. *See* Ex. 36 [Simona Boboila and Peter Desnoyers, *Write Endurance in Flash Drives: Measurements and Analysis* (USENIX Feb. 2010) (IDS#16)]. Boboila, which is intrinsic evidence included in Applicant's first IDS, states that "[a]lthough nominal device endurance ranges from $10^4$ to $10^5$ program/erase cycles, in Figure 4 we see that the number of cycles until failure was higher in almost every case, *often by nearly a factor of 100*." *Id.* at p.4; *see also id*. at p.2 ("trade-off" between "endurance and speed"). Thus, determining the endurance of an array is akin to predicting a future event, providing no objective boundary. *Berkheimer*, 881 F.3d at 1363.

"Enhanc[ing]" is also a term of degree not very different from "maximizing" minimizing", or "increasing" in its imprecision, and is an "unbounded and imprecise term[]," failing to provide the requisite guidance to a POSITA. *Advanced Display Techs.*, 2012 WL 2872121, at *14. Thus, for the foregoing reasons, the Court should find that the limitation "remapping . . . and transfer of data . . . to achieve enhanced endurance" is indefinite.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court adopt Defendants' proposed constructions and determinations of indefiniteness.

Dated: October 7, 2024

*/s/ Cono A. Carrano*
Cono A. Carrano
D.C. Bar No. 445995
ccarrano@akingump.com
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, DC 20006
Tel: 202-887-4000
Fax: 202-887-4288

George Andrew Lever Rosbrook
Texas Bar No. 24070141
arosbrook@akingump.com
Akin Gump Strauss Hauer & Feld LLP
112 E. Pecan St. Suite 1010
San Antonio, TX 78205
Tel: 210-281-7000
Fax: 210-224-2035

*Counsel for Defendants Kingston Technology Company, Inc., Kingston Digital, Inc., And Kingston Technology Corporation*

Respectfully submitted,

*/s/ Douglas E. Chin*
Douglas E. Chin
BBO # 671675 (Massachusetts State Bar)
Doug.chin@hsuanyeh.com
Hsuanyeh Chang, PhD
BBO # 684421 (Massachusetts State Bar)
hsuanyeh@hsuanyeh.com
Stephen Y. Chow
BBO # 082990 (Massachusetts State Bar)
stephen.y.chow@hsuanyeh.com
Edward Runyan
Bar License No. 6272971 (Illinois)
ed.runyan@hsuanyeh.com
Peter C. Yi
Bar License No. 1001347 (Dist. Of Columbia)
peter.yi@hsuanyeh.com

HSUANYEH LAW GROUP, PC
11 Beacon Street, Suite 900
Boston, MA 02108
Tel: (617) 886-9088

*Attorneys for Defendant Phison Electronics Corp.*

**CERTIFICATE OF SERVICE**

I, George Andrew Lever Rosbrook, counsel for Defendants Kingston Technology Company, Inc., Kingston Digital, Inc., and Kingston Technology Corporation hereby certify that on October 7, 2024, a copy of the foregoing DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF was served on all counsel of record via the Court's CM/ECF system.

*/s/ George Andrew Lever Rosbrook*
George Andrew Lever Rosbrook